As the Court knows, the facts of this case are particularly brutal. On August 24, 2011, Jennifer Morfe was brutally attacked by Robert Lee of Wright Yogurt. She was taken to an upstairs, second-floor storage room, choked out from behind. She awoke to find Lee binding her with duct tape and wrapping duct tape around her entire She was stripped naked, placed in a diaper, and had a shock collar placed around her neck. Once she was completely bound, she was placed in a coffin-type box with a hamster-like drinking bottle in an apparent attempt by Lee to keep her alive. After struggling to escape, Jennifer found herself in a room with bondage equipment. Lee had left to drive her car away. In fear and disbelief, Jennifer ran naked, save for a diaper, onto the street, into the nearest business for help. Lee was arrested later that day. After that, an action was instituted by Jennifer Morfe against Lee and Wright Yogurt. Later on, TSL development was added. On October 3, 2011, Lee and Wright Yogurt tendered their defense to AMCO Insurance Company. During that time, AMCO, it took them more than three months to merely forward it to Insurance Council for review. During that time, Lee and Wright Yogurt, believing they had been abandoned by the insurance company, settled the case with Morfe and assigned their rights to collect against AMCO Insurance Company to Morfe. Let me ask you about that because AMCO is now, of course, relying on their insurance contract to say that you voluntarily settled the case without their consent while they were reviewing the matter. And so it's not a situation where they refused to defend or they said we're not going to deal with this. There were communications indicating that, look, we are reviewing the policy. These are intentional, obviously intentional, horrific acts, and so their investigation is ongoing. What's your best case to support the theory of abandonment? Because abandonment really comes in a situation where there is an affirmative refusal to defend or maybe even an absence of any meaningful communication from the insurance such that you can say that they're being so unresponsive, we felt like we were left on our own, and so the insurance had no choice but to defend. It isn't that type of a case. So do you have any authority to support your argument that this was an abandonment situation? Yes, I would rely on Jamestown Builders, as cited in the brief. In that case, it is stated that the purpose of a no-voluntary payment provision is to ensure that responsible insurers promptly accept the defense tendered by their insureds and thereby gain control over the defense and settlement of the claim. This wasn't accepted promptly. This promptly is a week or two, but here's three months of communication. Well, except didn't you even, like, you were doing this negotiation and you didn't even convey something for over a month to AMCO? Well, I wasn't the counsel involved. That is the facts that are in the record. Yeah, but isn't that in the facts also? Yes, yes. So, well, let's get the exact timeline, because when was the claim turned in? The claim was tendered October 3rd, 2011. And you, well, your side, as it, well, I mean, I know that in terms of paid, you received payment by the end of December of that same year, correct? First week of January. Okay, so essentially, so everything, so money was received and settled by, and the first, the negotiations that were going on there, my recollection of the record is that your side held onto something for, I think, five weeks before they even conveyed that to the insurance company under, while they were deciding whether, under a reservation of rights, whether they were going to defend on this, right? That is correct. So those five weeks, do you count against the, and so how long after you actually told, when did you actually tell them that you were, that you settled for a million? That was the second week of January in which it was told. So it was actually after the settlement had been made that the settlement was conveyed to Amco Insurance Company. That's actually quite a while after, I think, several weeks, wasn't it? I believe it was about a week or two after the fact. Yeah, it's a couple of weeks. So who bears the fault of that six weeks of delay between the time that the insurance, between the time that the settlement demand was made and that settlement demand was communicated to Amco? I do believe it should have been communicated much earlier, and it was not. So who bears the responsibility for that? Could that be uninsured? In that sense, it would be, yes, Your Honor. But I will say, pointing to- That's when your abandonment case sort of falls apart, right? You indicated that you notified them of a potential claim in October. I see here October 7, Amco promptly responded to say, look, we received the tender.  And then November 7, so shortly after this lawsuit commenced, you received a settlement demand, but it wasn't until December 20 that the fact of a settlement demand was made, was even communicated to Amco. So that kind of shortens the time period that Amco had to really conduct a fair evaluation of whether the claim should be covered or whether a duty defendant is triggered. That is true, Your Honor. With regards to Lee, I believe there are definitely more considerations that need to be involved in whether or not they should accept the defense for Lee. But with regard to Wright-Yogurt- Well, I mean, this looks so much like a criminal act. And, I mean, I was a prosecutor for a long time. And, I mean, most people don't keep a coffin standing by with all of these. You know, clearly, if I were arguing this case, and apparently Mr. Lee killed himself before he was convicted, but it's pretty hard to say this wasn't a premeditated criminal type of act. There might be someone in the whole world that would say that, but I think you would have a very small universe of people that would come to that conclusion. And then even under the most- the recent California Supreme Court case wasn't even available at that particular time. So this- I'm actually surprised that the insurance company didn't say in three seconds, you have no coverage. But they didn't. They looked into it and looked under every- they're looking under rocks to see if they do have some duty to defend first, as opposed to whether they would actually pay it. So it just doesn't seem like a very long period of time. Yes, Your Honor. With respect to Lee, I believe you are correct. It is a much smaller universe in which they wouldn't need to accept the defense. However, with regards to Wright Yogurt, Wright Yogurt was also an insured underneath it. And Wright Yogurt is a separate entity from Lee. Well, Lee wasn't really even an employee. He was like a half-owner, right? Yes, 50%. So how- I think that under the theories of negligent hiring or whatever, it's not- he's not even an employee that got hired, right? I mean, he's an owner. Yes. But that being said, can you point to anywhere in the record that Wright Yogurt and Lee faced financial ruin if they didn't agree to pay $1 million by December 31st of 2011? Not within the record, but by implication. Okay. Well, she had settled, and she- first of all, let me say I can understand, and when I looked at this, I could not agree more with Judge Callahan. The facts in this case are such that I would have thought that the insurance company would have just said, wait a minute, this is an intentional act. There's an exclusion for intentional acts. That's it. But I can certainly understand why the insurance company would want to be very careful here and really survey the law. First of all, the facts here are terrible, and one can only have tremendous admiration for this young woman who- I don't know how she got herself out of that box and got herself untaped and so forth and escaped, but that displays a tremendous amount of courage and- She was going to be dead. There's no question about it. She would have been brutally raped, probably tortured and killed, and she got herself out of there. But these are terrible facts, so the insurance company is looking at, oh, my goodness, we had better make sure we thoroughly investigate this and make sure that there isn't something there. And then you have the complication, as again, Judge Callahan pointed out, this guy is actually an owner of the company, and so you've got to survey that law. Maybe there's something floating around out there. So I am having a really hard time seeing where they did anything particularly wrong here except doing exactly what you want an insurance company to do, and that is not make a snap judgment. And as far as the horrific financial situation, this isn't the business context. We don't have a situation where if a payment isn't made, the business is going to fail. I mean, this is a young woman who was working for a wage. She had a terrible, terrible experience, but she did settle the case. She got the first, I think, $275,000 or so. I don't know that she's gotten any more payments since then, but she did get that. And I just don't see the financial disaster that you appear to suggest exists, such that it amounts to duress, which I think you know is a very high standard. Yes, Your Honor. Within the record itself, there is nothing there explicitly, as the court knows. Unfortunately, we no longer have Mr. Lee to testify to any of that. But I think the court can easily imply that with quickly moving civil litigation as well as criminal prosecution, also with the facts, I think one can reasonably determine there would be a judgment possibly well in excess of $1 million. And I understand that's conjecture, but I think looking at these facts as well as the financial ability, which again is not in the record of Mr. Lee, one would be able to determine that. Well, the case got stayed for like two or three years while his criminal trial was pending. I believe it was about three or four years. Three or four years. So, I mean. You've got a tough case all the way around. Yes, very much so. Do you want to reserve for rebuttal? I would, please. Okay. Thank you. I appreciate that. Thank you. Good morning. Good morning, Your Honors. May it please the Court. My name is Brian Plana, and I represent Amco Insurance Company. Now, there are several independent reasons why this court should affirm the judgment below as a result of the multitude of policy provisions at issue. Now, some of those reasons require far less analysis than others, as the Court is surely aware from reading the party's briefing. But there are two very easy paths to an affirmance of the judgment below, the first being by way of the policy's no voluntary payments provision, or the NVP, and the second being by way of the policy's abuse or molestation exclusion. Now, the policy's NVP provision specifically states that no insured,  incur any obligation, or incur any expense without Amco's consent. Now, the undisputed facts in this record establish that Robert Lee and Wright Yogurt's settlement with Ms. Morphy were undisputedly voluntary and made without Amco's consent. Ms. Morphy made her written settlement demand for $1 million to Wright Yogurt and Lee's counsel on November 7, 2011. It's undisputed that Wright Yogurt and Robert Lee did not even advise Amco of that settlement demand until more than a month later on December 20, 2011. Then Lee and Wright Yogurt went ahead 11 days later and settled with Ms. Morphy for $1 million without obtaining Amco's consent and without even advising Amco that they were going to settle. They didn't even advise Amco of the settlement until January 9, 2012. Now, Ms. Morphy has not cited a single case that supports her contention here on appeal that Lee and Wright Yogurt's $1 million settlement with her was involuntary. Ms. Morphy's counsel just cited the Jamestown Builders case, but that case affirmed judgment on the NVP provision in favor of the carrier. In that case, we're talking about a settlement that occurred pre-tender. Ms. Morphy has also not cited any case in which a carrier was required to reimburse a policyholder for an unauthorized settlement payment that was made before the carrier ever made a coverage determination. Now, the court has already asked this issue during Morphy's counsel's argument, but Morphy's first argument is that we should just avoid the application of the NVP provision here because Lee and Wright Yogurt's settlement with her was involuntary and made out of economic necessity because they were under duress and facing financial ruin. There are two problems with that argument, the first being that there is no evidence in the record to support that Lee and Wright Yogurt were ever under duress or facing financial ruin. The second problem with that argument is that Ms. Morphy herself has conceded that three days after she executed the settlement agreement with Lee and Wright Yogurt on December 31st, she received payment from Lee and Wright Yogurt in the amount of $225,000. Now, if Lee and Wright Yogurt had $225,000 in cash on hand as of December 31st, 2011, which was only 90 days after Morphy had even initiated this action against them, then they clearly had sufficient funds to continue funding their defense if not through trial, at least for a substantial period of time thereafter. Now, Morphy nonetheless contends that the urgency of the court proceedings somehow made Lee and Wright Yogurt's settlement with her involuntary and out of economic necessity. But there are no facts in this record to suggest that there was any urgency whatsoever in those proceedings. Morphy made her settlement demand only 40 days after she initiated the action against Robert Lee and Wright Yogurt. Furthermore, her settlement demand, which was made on November 7th, did not even specify a time limit in which it had to be accepted. It was simply an open demand. There simply isn't any evidence in the record to suggest there was any urgency in the proceedings 90 days after the suit had been filed. By the time of the settlement, Lee and Wright Yogurt had already retained defense counsel, and this isn't a situation in which the insured Wright Yogurt made some immediate unauthorized payment to try and avoid a default judgment because it's undisputed that as of December 31st, 2011, Wright Yogurt had already filed a response to Morphy's complaint. Now, the next argument, which the court touched on earlier, Morphy makes, is that, well, we should just ignore Lee and Wright Yogurt's breach of the NVP because AMCO had somehow breached the insurance contract or abandoned Lee and Wright Yogurt as of December 31st. Morphy's brief claims that AMCO ignored Lee and Wright Yogurt's tender and failed to even respond to their counsel's requests. Now, there is no evidence in the record to support either of those allegations, and the uncontradicted evidence in the record demonstrates that AMCO communicated with Lee and Wright Yogurt and or their counsel multiple times during that 90-day period following the tender. In any event, the cases that have discussed this carrier breach exception to the NVP have discussed it only in the context of a carrier's complete refusal to defend or indemnify. That didn't happen here because AMCO had not even made a coverage decision by the time Lee and Wright Yogurt had decided to settle with Ms. Morphy. Now, the California Court of Appeal upheld the application of an NVP provision under nearly identical circumstances in the Lowe v. Golden Eagle case. In that case, it took the carrier more than four months after tender to even accept the insured's defense. But during that interim period after tender and before the acceptance of the defense, the policyholders went out and independently settled the claims against them without the carrier's knowledge or consent. By the time the carrier finds out about the settlement, it, of course, denies coverage for it based on the NVP provision. Now, this case has somewhat of a tortured procedural history, but by the time it made it to the Court of Appeal, the Court of Appeal held that there was no carrier breach, even though there was a four-month period in which it took the carrier to make a decision, and that coverage for the settlement was barred based on the NVP provision. The facts of this case are analogous to Lowe. Lee and Wright Yogurt independently settled with Ms. Morphy three months after tendering their defense. They did so without AMCO's knowledge or consent, and they did so before AMCO even made a coverage decision. In sum, the Court needs to look no further than the facts surrounding the tender, the settlement, and the language of the NVP provision to affirm the judgment below. But even assuming for the sake of argument that the NVP provision somehow doesn't bar coverage for the million-dollar settlement, the policy's abuse or molestation exclusion clearly does. Under coverage A and coverage B of the policy's liability form, there is no coverage for any injury arising out of the actual or threatened abuse by anyone of any person while in the care, custody, or control of any insured. Now, Morphy's first argument with respect to the application of this exclusion is that we just shouldn't apply it here because the terms abuse and molestation are somehow ambiguous. Now, while neither this circuit nor any California court has ever interpreted this provision, every other court in the country that has done so has held it to be unambiguous. That includes four Federal Circuit Courts of Appeal, the First Circuit, Third Circuit, Eighth Circuit, and Tenth Circuit. Those cases are outlined on page 53 of AMCO's brief. The common dictionary definition of the term abuse is physical maltreatment or to treat with cruelty or violence. Those definitions come out of Merriam-Webster in the English Oxford Dictionary. Ms. Morphy has not proffered any alternative definitions of the word to suggest any ambiguity. The undisputed facts of this record in the attack, which Ms. Morphy's counsel referenced earlier, unequivocally established that Lee's conduct towards Ms. Morph on the morning of August 24, 2011, qualify as abuse under the ordinary definition of the word. Lee choked her, he put a shock collar around her neck, he stripped her of her clothes, he bound her head with duct tape, he dropped her in a coffin-type box. Any construction of the term abuse that doesn't encompass those facts would surely be unreasonable. Now, the second inquiry under the abuse exclusion, which is what Ms. Morphy primarily contests in her brief, is whether she was under the care, custody, or control of an insured when the attack occurred. She was. Morphy was unquestionably under the control of Wright Yogurt when the attack occurred, and that's because she has conceded in response to AMCO's request for admissions, numbers 18 through 22, that the attack occurred, number one, while she was an employee of Wright Yogurt, two, at Wright Yogurt's yogurt shop, and three, while she was working her scheduled shift. Now, under California law, employees by definition are persons who perform services subject to the right of their employer's control. And in the Valley Forge case, the First Circuit Court of Appeals interpreted this exact language and explained that persons under the control of an insured include those persons under the management or supervision of an insured, which certainly would include employees such as Ms. Morphy. In this case, the only reason Ms. Morphy was even at the yogurt shop on the morning of August 24, 2011, was that Wright Yogurt, her employer, required her to be there at that time. And the only reason she even went up to the storage room where the attack took place was because Robert Lee, her boss, asked her to go up there to help him carry some boxes. The same facts established that Ms. Morphy was also in the care of Wright Yogurt when the attack occurred. Under California law, employers owe employees a duty of care to furnish a safe place of employment. Morphy herself alleged at paragraphs 37 and 38 of her underlying complaint against Lee and Wright Yogurt that they owed her a duty of care. Now, because we're here on summary judgment, Morphy tries to wiggle out of application of the abuse exclusion by claiming that there was some disputed issue of fact as to whether she was actually on the premises of Wright Yogurt when the attack occurred. Now, there are two problems with that argument. The first is that even assuming that were true, the plain language of the abuse exclusion does not require that the abuse occur on the insured's premises for the exclusion to apply. And, in fact, in the Valley Forge case, the First Circuit upheld the application of this exclusion under facts in which the abuse, in fact, did occur off the insured's premises. In any event, Ms. Morphy cannot even stand here and make the argument on appeal that the attack did not occur on Wright Yogurt's premises because she conceded in response to AMCO's request for admission number 19 that the attack, quote, took place at Wright Yogurt's yogurt shop. She made the same judicial admission in paragraphs 9 and 10 of her counterclaim against AMCO in this case. Now, this circuit has repeatedly held, most recently in the Tillamook Country Smoker case,  is conclusively established, even if there is compelling evidence to the contrary. Thus, the policy's abuse exclusion has a very straightforward application to the facts of this case and requires an affirmance of the judgment below. There are several other bases for an affirmance of the judgment below set forth in AMCO's briefing, including the application of the worker's compensation exclusion, the bodily injury to an insured exclusion, and the criminal act exclusion. But the most obvious and straightforward bases for an affirmance of the judgment below are by way of the policy's no voluntary payments provision and the policy's abuse exclusion. I have nothing further, Honor, unless you have any questions. So if, let's just assume for purposes of argument that we don't buy any of those, the recent Supreme Court Cal Supreme's liberty surplus, that doesn't help Mr. Lee, right? But it could help the yogurt company, right? The short answer to that is no. And what the California Supreme Court recent decision on that that just came out a couple of weeks ago, if you read the decision in that case, it doesn't appear that there was any abuse exclusion at issue in that case. What that case held was essentially that there could be an occurrence as to the employer under a theory of negligent supervision. Negligent hiring or supervision or something like that. Right. And in this case, the language of the abuse exclusion under both coverage A and coverage B would preclude any sort of coverage under that theory. I guess what I'm just saying is I'm taking every argument as you're posing, you're saying the easiest way is deal with the MVP. Correct. Then abuse. But let's just say all of those go away and we had to look at that, then that case could arguably apply. But you're saying even under that, you win. Well, it could apply if we ignore the abuse exclusion, for instance. But there are still other exclusions in this policy that would apply, namely under coverage A, the bodily injury to an insured exclusion, and then under coverage B, the criminal act exclusion. So that would be a whole alternative basis where you could find no coverage. But that would be for everything, under everything. So bodily injury to an insured exclusion under coverage A would exclude all coverage, and the criminal act exclusion under coverage B would exclude all coverage under that line of coverage as well. So that would be another basis the court could do it. It's just you would have to do two different analyses under coverage A and coverage B. All right. Thank you for your argument. Thank you. Thank you. May it please the court. Viewing the facts most favorable to the non-moving party, viewing the evidence most favorable to the non-moving party, a reasonable juror could determine that at least with respect to Wright-Yogurt, the defense was not promptly assumed by AMCO, and with that I point to the duty to defend is that if you just merely create the potential for coverage, there is a duty to defend. So in that regard, there would be a duty to defend that a reasonable juror could find with regard to Wright-Yogurt. With respect to the abuse and molestation exclusion, in terms of care, custody, and control, I would point to star indemnity, in which two minor children were removed from the premises before being molested by the individual. The insurer's motion for summary judgment was denied, emphasizing that the abuse or molestation must occur while in the actual care, custody, or control of the insured. So they were actually taken off the premises. In this case, Jennifer Morphy had never been to this second-floor storage room that had an entirely different entrance off of the main street. She'd never been there before, and it wasn't her usual workplace in the actual yogurt shop. While that premises on the second floor was owned by Wright-Yogurt, it was not her usual place of employment. But she was lured up there by Lee. Wasn't she told to go up there? Yes. Move some boxes. Move boxes, which would have been part of her job duties or part of her responsibilities. So she was clearly under the care, custody, and control of him. He's Wright-Yogurt. Yes. Moving boxes wasn't a particular point in her job description. But also, there was no actual boxes to move. It was just completely illusory, just a lure to get up there. Of course. I understand that. But she was under his care, custody, and control. She was within the building owned by Wright-Yogurt. He told her to go up there as part of her job, and she did. Yes. Of course, he had this nefarious purpose of luring her up there, but it doesn't change the fact that, I mean, he didn't tell her to get in the car and I'll meet you two blocks from here in a hotel room. So she was under the care, custody, and control of Lee at that time, potentially. But she wasn't in the care, custody, and control of Wright-Yogurt. But he's the owner. But he wasn't acting in furtherance of the business. He was acting with an adverse relationship to the Wright-Yogurt. And so his knowledge of what's going to occur can't be imputed to the business, and we've cited that in the brief as well. And we beg that justice be found for Jennifer Morphy today. All right. Thank you both for your argument. It was very helpful. And that matter will stand submitted. The last matter on calendar is Cabani Company v. U.S. Securities and Exchange, 17-70786. That matter's been submitted on the briefs and will stand submitted as of this time. That concludes the calendar for today, and this court will be in recess until tomorrow at 9 a.m. Thank you.
judges: Callahan, Nguyen, Ezra